1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOHN R. VANCE, JR., State Bar No. 51744
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5864
    Fax:  (415) 703-1234
8   Email:  John.Vance@doj.ca.gov
   Attorneys for Respondent

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

| | |
|---|---|
| **ANTONIO SCOTT,** | C07-4279 CRB (PR) |
| Petitioner, | |
| **v.** | |
| **TOM FELKER,** | |
| Respondent. | |

13

14

15

16

17

18

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ANSWER TO ORDER TO SHOW CAUSE**

19

20

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOHN R. VANCE, JR., State Bar No. 51744
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5864
    Fax:  (415) 703-1234
8   Email:  John.Vance@doj.ca.gov
   Attorneys for Respondent
9
                    IN THE UNITED STATES DISTRICT COURT
10
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
11

12  **ANTONIO SCOTT,**                          C07-4279 CRB (PR)

13                              Petitioner,      **MEMORANDUM OF POINTS AND
                                                 AUTHORITIES IN SUPPORT OF
14       **v.**                                  ANSWER TO ORDER TO SHOW
                                                 CAUSE**
15  **TOM FELKER,**

16                              Respondent.

17

18                          **STATEMENT OF THE CASE**

19          By information filed April 10, 2003, the Alameda County District Attorney charged

20  petitioner with kidnaping for carjacking (Cal. Pen. Code, § 209.5, subd. (a)); two counts of

21  kidnaping for robbery (Cal.Pen. Code, § 209, subd. (b)(1)); two counts of carjacking (Cal.Pen. Code,

22  § 215, subd. (a)); two counts of second-degree robbery (Cal.Pen. Code, § 211); and two counts of

23  false imprisonment by violence (Cal.Pen. Code, § 236).  The information alleged petitioner used a

24  "replica assault weapon," a deadly weapon (Cal. Pen. Code, § 12022, subd. (b)(1)), and alleged a

25  second-degree robbery conviction as a  serious felony (Cal. Pen. Code, § 667, subd. (a)), and as a

26  strike (Cal. Pen. Code, §§ 1170.12, subd. (c)(1); 667, subd. (e)(1)).  Exh. A, CT 7-16.

27          On April 11, 2003, petitioner pled not guilty and denied the  enhancements.  Exh. A, CT

28  6.

1    On August 22, 2003, the prosecutor dismissed one kidnaping charge.  Exh. A, CT 147-

2    148.

3    On April 9, 2004, the jury convicted petitioner on the remaining counts and found the

4    deadly weapon allegations true.  Exh. A, CT 308-315.  After petitioner waived his right to a jury trial

5    on the prior conviction allegation, the court found it true.  Exh. A, CT 246, 306-307.

6    On June 25, 2004, the court sentenced petitioner to state prison for an indeterminate term

7    of life with a minimum 14 years before parole eligibility, consecutive to a term of 17 years.  Exh.

8    A, CT 343-348.

9    On May 31, 2006, the state court of appeal affirmed petitioner's convictions.  Exh. B.

10    On September 13, 2006,  the state supreme court denied review.  Exh. C.

11    On September 7, 2007, petitioner filed the instant petition.

12    On January 9, 2008, this Court issued an order to show cause.

13    **STATEMENT OF FACTS**

14    We take the statement of facts from the decision of the state appellate court:  That

15    summary is presumed accurate.  *Hernandez v. Small*, 282 F.3d 1132, 1135, n. 1 (9th Cir. 2002).

16    At trial, the jury heard evidence of three incidents of carjacking, kidnapping and
17    robbery in the same locale in Oakland in mid-to-late December 2002 against three
     separate victims, Santiago Buenrostro, Brigido Obregon, and Artemio Saucedo. Scott was
18    charged and convicted of offenses only against Obregon and Saucedo. Before trial, a
     hearing was held on the People's motion to admit evidence of the Buenrostro crimes
19    pursuant to Evidence Code section 1101, subdivision (b). The trial court ruled evidence
     of the uncharged Buenrostro conduct could be admitted at trial to show a common scheme
20    or design. The People presented evidence of the uncharged Buenrostro crimes, and the
     jury was instructed to consider it only if it tended to show a common scheme or plan. The
21    three incidents and other relevant facts are described below.

22    A. The Charged Offenses

23    1. December 16, 2002 Incident Involving Victim Brigido Obregon

24    On December 16, 2002, Brigido Obregon stopped in his white Chevy Blazer at Pak'n
     Save in Oakland at around 6 p.m. Obregon heard voices behind him, felt what he took to
25    be a gun pushed into his back, and was told to get in the rear of his vehicle. Obregon was
     placed in the middle of the back seat with a man on either side of him. A woman sat in the
26    front passenger seat and another man was in the driver's seat; all these individuals were
     African-American. The man in the driver's seat wore a wig, a baseball hat, and his face
     was covered with a bandana from the nose down.
27    After Obregon was in the vehicle, the assailants stripped him of money, rings, chain,
28    and bracelets. The man in the bandana held a big gun. They drove off, but Obregon could
     not see where they were going because he was told to keep his head down. After about ten

to fifteen minutes, the car stopped and Obregon was taken into an apartment. The three men took Obregon into a bedroom with the window covered by a piece of sheetrock, where he was robbed of his wallet, beeper and shoes. Later, the man in the bandana came into the room and demanded pin numbers for Obregon's credit cards. He was carrying the gun and wearing Obregon's ring and bracelet, and he threatened to shoot Obregon unless Obregon gave him the pin numbers.

Obregon estimated he was held in the apartment for about 20 hours. Eventually, Obregon was placed in his truck, driven close to San Leandro, and left there after his assailants told him not to look where they were going and to wait a few minutes before leaving. After five or ten minutes, Obregon drove home and called the police.

During his captivity at the apartment and for only seconds on each occasion, Obregon twice observed through the open bedroom door the man in the bandana without his disguise. Obregon did not identify Scott as the man in the bandana from a photo line-up about a week after the incident but did identify the woman as Scott's co-defendant Sandra Miller. When shown the same photo display at the preliminary hearing, Obregon chose two males as possibly being the assailant, one of whom was Scott. At trial, Obregon unhesitatingly identified Scott as the man he described as wearing the disguise and handling the gun. Obregon testified that People's Number 8 (black paintball gun) was the weapon used in the offense, and an arresting officer described the weapon (People's 8) as an assault type pistol that shoots paintballs but not bullets.

2. December 24, 2002 Incident Involving Victim Artemio Saucedo

On December 24, 2002, at around 7:30 p.m., Artemio Saucedo drove his Ford Thunderbird to an apartment on 89th Avenue, Oakland, in response to a for-rent advertisement posted in a local store. Inside the apartment were a man and two women, one heavy set and one thin. Saucedo was kept waiting for a few minutes before the man got up and pointed a gun at him. Saucedo later described the weapon to the police as a big bazooka-like gun and, at trial, identified the black paintball gun (People's 8) as the gunman's weapon. The gunman told the heavy set woman to search Saucedo, and she took his wallet and car keys. At one point someone knocked on the front door and Saucedo was hastily ushered into a bedroom with a mattress on the floor and the window covered by a piece of sheetrock. There, the gunman demanded the correct pin number for Saucedo's ATM card. After obtaining the pin number, the gunman left the apartment, leaving the thin woman alone to guard Saucedo After awhile, the thin woman fell asleep, and Saucedo escaped. Once outside the apartment, Saucedo saw his car was gone, so he ran all the way home and called the police from there. On December 30, Saucedo identified Scott from a photo lineup as the gunman and also identified Sandra Miller as the heavy-set woman who took his wallet and car keys. Saucedo also identified Scott at trial as the gunman at the apartment. B. Uncharged Incident Involving Victim Santiago Buenrostro

On the evening of December 15, 2002, Santiago Buenrostro was driving his blue 1989 Toyota Corolla on International Boulevard near 88th and 89th Avenues when he stopped at a pedestrian crosswalk. A man got in the rear driver's-side door and put a gun to Buenrostro's head. Another man got in the rear passenger side door and a woman got into the front passenger seat. All were African-American. Buenrostro was ordered to make a right turn and after a few blocks told to stop. During that time, his assailants took his wallet, watch and ring.

While the car was stopped, Buenrostro was pushed into the back seat, and the man who had been sitting in the rear passenger-side seat took over the wheel. The assailants drove around for about twenty or thirty minutes before they stopped at what Buenrostro took to be an ATM machine, because the man who had the gun asked Buenrostro for his pin number. After about an hour, the car stopped somewhere in West Oakland. The man in the back of the car pulled Buenrostro out and threw him on the ground. The two men

took his boots. They stood Buenrostro up and walked him to the edge of the lot. Buenrostro started to scream. The men pushed Buenrostro face down in the mud and punched and hit him. Buenrostro pretended to be unconscious, and after he heard the assailants drive away in his car, he stood up and went to the first house he saw to call the police.

At one point while he was still driving the car, Buenrostro tried to open the door to escape. The man behind him struck him on the back of the head with the gun, and the woman in the passenger seat punched him on the cheek with her fist. Buenrostro described the weapon used in the incident as a six-inch blue revolver. Buenrostro identified none of his assailants. He could not identify Scott as one of the perpetrators either at trial or from an earlier photographic line-up. Nor was he able to give a height and weight description to the police following the incident of any of the assailants.D. Other Relevant Details

On December 18, 2002, Oakland Police Officer John Cowles conducted a search at Apartment 4, 1347 89th Avenue on a matter related to his duties on the Beat Health Unit dealing with problem properties in the community. In a bedroom in the apartment, Cowles found a vehicle registration document stating the license plate and name of the registered owner (Santiago Buenrostro). Cowles stated Scott was not present when he searched the apartment, and he had no information Scott lived at that address. He also stated the police had received several complaints about the apartment being a problem property associated with drugs and prostitution.

On December 23, 2002, Officer Daniel Sakai spotted the blue 1989 Toyota Corolla, license number 2RXV 314, belonging to Santiago Buenrostro, parked in the 1300 block of 89th Avenue. Officer Sakai testified that the Pak'n Save on Hegenberger Road (where Obregon was abducted) is within a mile or so of the 1300 block of 89th Avenue where he found Buenrostro's vehicle.

On December 27, 2002, Officer Parkinson found Saucedo's light blue Thunderbird parked outside 1347 89th Avenue, an address Parkinson associated with suspected carjacking activities. Parkinson and other officers subsequently went up to apartment 4 at that location and were allowed in by the occupant, Charlotte Johnson. Scott and Sandra Miller were found in a bedroom in the apartment with a mattress on the floor and the window covered with sheetrock. At the foot of the mattress was a black pistol grip type assault gun, together with a smaller handgun.[FN3] The police handcuffed Scott and Miller and sat them on a couch in the living room. Miller asked for her jacket. Officer Marv Jackson searched the jacket before handing it to Miller. The keys to Saucedo's Thunderbird were found in a pocket of Miller's jacket. Later that day, Officer Jadallah interviewed Scott at the Eastmont Police Station and noticed that Scott was wearing the large gold ring with a Star of David stolen from Brigido Obregon. At trial, Obregon identified the ring as the one taken from him.

FN3. There is no evidence in the record connecting this handgun to any of the crimes at issue. Scott did not testify in his defense. In closing argument, defense counsel attacked the reliability of Obregon's and Saucedo's identifications of Scott and argued the prosecution failed to place Scott at the scene of the crimes beyond a reasonable doubt and that police were tipped off about Scott by a drug-dealing informant who was possibly the perpetrator.

Exh. B.

///

///

///

1

**STANDARD OF REVIEW**

2        A federal court may grant a writ of habeas corpus to a state prisoner only if the state

3 court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application

4 of, clearly established Federal law, as determined by the Supreme Court of the United States" or

5 were "based on an unreasonable determination of the facts in light of the evidence presented" in the

6 state courts. 28 U.S.C. § 2254(d). Under the "contrary to" clause, a state court's decision is

7 contrary to federal law if it "contradicts the governing law set forth in our [United States Supreme

8 Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision

9 of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*,

10 529 U.S. 362, 405-06 (2000); That test does "not require citation of our cases -- indeed, it does not

11 even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court

12 decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). The ultimate

13 controlling authority is the Supreme Court's holding, as opposed to the dicta, of its decisions at the

14 time of the relevant state-court decision. *Williams v. Taylor,* 529 U.S. at 412. The state courts are

15 presumed to "know and follow the law," and the standard for evaluating state-court rulings, which

16 are given the "benefit of the doubt," is "highly deferential." *Woodford v. Visciotti*, 537 U.S.19, 24

17 (2002) (per curiam). In order to warrant habeas relief, the state court's application of clearly

18 established federal law must be not merely erroneous or incorrect but "objectively unreasonable."

19 *Williams v. Taylor*, 529 U.S. at 409; *see also Woodford v. Visciotti*, 537 U.S. at 25. It is the habeas

20 petitioner's burden to make that showing. *Id.*

21

**ARGUMENT**

22

23    **THE STATE COURT OF APPEAL'S DETERMINATION WAS A REASONABLE APPLICATION OF CONTROLLING UNITED STATES SUPREME COURT AUTHORITY; AND ANY ERROR WAS HARMLESS**

24

25    **A.  Petitioner's Contention**

26        Petitioner contends, "Through evidentiary and instructional error with respect to the

27 uncharged crimes petitioner was denied his right to a fair trial." Petition, 6, 20.

28        The state court of appeal "conclude[d] the trial court erred in admitting evidence of

1   uncharged misconduct, but affirm[ed] [the judgment] because the error was not prejudicial." Exh.

2   __.  It did so, first, applying the error harmless under the standard of *People v. Watson*, 46 Cal.2d

3   818 (1956) for state law violations, and, then, finding no due process violation.

4          In addition, the state court of appeal's determination was not unreasonable.  In any event,

5   any error was harmless under *Brecht v. Abrahamson,* 507 U.S. 619 (1993).

6      **B.    The State Appellate Court Decision**

7          The state court of appeal found the trial court had erred under state law in admitting

8   evidence, but found that the error was harmless law and did not violate due process.

9      *A.    Evidence of Uncharged Conduct*

10     *1.    Evidence Code § 403(a)*

11         For evidence of the uncharged Buenrostro crimes to be admissible, the trial court first
       had to find that there was sufficient evidence from which the jury could find by a
12     preponderance of evidence that Scott was one of Buenrostro's assailants. (Evid.Code §§
       403, subd. (a); *People v. Simon* (1986) 184 Cal.App.3d 125, 131-132.) We review the trial
13     court's determination on this issue for abuse of discretion. ( *People v. Marshall* (1996) 13
       Cal.4th 799, 832-833.)

14

15         Scott contends the trial court abused its discretion with respect to the preliminary fact
       of his involvement in the Buenrostro carjacking and robbery because the only
16     circumstantial evidence linking him to those crimes was: (1) the registration document for
       Buenrostro's vehicle was found in a bedroom in the apartment where Scott was arrested
17     about ten days later; (2) Buenrostro's vehicle was found on the same block as the
       apartment where Scott was arrested about four days later. Not so. There was other
18     evidence presented at the hearing which linked him to the Buenrostro crimes. Specifically,
       only four days after police found Buenrostro's carjacked vehicle, they found Saucedo's
19     carjacked vehicle in the same location, right next to the apartment where they
       contemporaneously arrested Scott. When police arrested Scott and his female accomplice
20     Miller, they found the keys to Saucedo's carjacked vehicle in Miller's jacket pocket.
       Nonetheless, it is still a close question whether the trial court abused its discretion by
21     inferring from all the circumstantial evidence that Scott was involved in the Buenrostro
       carjacking. However, we need not decide whether this evidence provided the trial court
22     with adequate support for its ruling at the 403 hearing because there is a more fatal flaw
       to the admission of this evidence.        *2. Common*

23                                      *Scheme or Plan*

24         Scott contends that even if the trial court did not abuse its discretion in linking Scott
       to the Buenrostro crimes, it erred by admitting evidence of those crimes to show common
25     scheme or plan because evidence of a common plan was irrelevant to the main issue in the
       case-identity We agree.

26

27         In *People v. Ewoldt* (1994) 7 Cal.4th 380 (*Ewoldt* ), the Supreme Court discussed the
       different purposes for which evidence of uncharged conduct may be admitted. The
28     Supreme Court stated evidence of uncharged conduct could be introduced to show: (1)
       intent; (2) common design or plan; or, (3) identity; and noted there are "subtle but

significant" differences among the three: "Evidence of intent is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. [¶¶] Evidence of a common design or plan is admissible to establish that the defendant committed the act alleged. Unlike evidence used to prove intent, where the act is conceded or assumed, [i]n proving design, the act is still undetermined. [¶¶] Evidence of identity is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator." (*Id.* at p. 394, fn. 2.) The Supreme Court underscored the importance of these distinctions, stating: "[I]t is imperative that the trial court determine specifically what the proffered evidence is offered to prove, *so that the probative value of the evidence can be evaluated for that purpose."* (*Id.* at p. 406) (Italics added.)

In this case, the trial court purportedly admitted evidence of the Buenrostro incident to show Scott engaged in a common scheme or plan, not for intent or identity. But this is not a case where defendant offered an innocent explanation for his conduct or disputed he committed any wrongdoing despite his presence at the scene of the crime-in such circumstances ""the act is still undetermined"" and evidence of uncharged conduct to show a common scheme or plan is highly probative on the issue of whether defendant committed the wrongful act as alleged. (*Ewoldt, supra,* 7 Cal.4th at p. 394-395 & fn. 2; see also *People v. Balcom* (1994) 7 Cal.4th 414, 422-426 [evidence of subsequent rape and robbery properly admitted to show common scheme or plan where defendant conceded he engaged in sexual intercourse with the victim but claimed he did not use a gun and victim voluntarily consented].) However, there was no dispute here that Obregon and Saucedo suffered as they described at the hands of their assailants-the contested issue was whether Scott was the individual wielding the replica assault weapon against them. In this situation, the existence of a common scheme or plan had no probative value, was not relevant to any issue in the case, and amounted to inadmissible propensity evidence. (See Evidence Code section 1101, subd. (a); see also *Balcom, supra,* 7 Cal.4th at p. 422 [evidence that defendant committed an uncharged offense may be admitted ""if relevant to prove some *relevant* fact other than the defendant's character"" (italics added.) ].)

Accordingly, the trial court erred by admitting evidence of the Buenrostro crimes under the theory of common scheme or plan.[FN4] (See *Ewoldt, supra,* 7 Cal.4th at p. 406 [noting "in most prosecutions for crimes such as burglary and robbery, it is beyond dispute that the charged offense was committed by someone; the primary issue to be determined is whether the defendant was the perpetrator of that crime. Thus, in such circumstances, evidence that the defendant committed uncharged offenses that were sufficiently similar to the charged offense to demonstrate a common design or plan (but not sufficiently distinctive to establish identity) ordinarily would be inadmissible"].)

FN4. We do not reach the issue of whether evidence of the Buenrostro crimes may have been admissible on the issue of identity. The People never sought to admit the Buenrostro evidence to prove the identity of Scott as the perpetrator of the Obregon and Saucedo offenses, the trial court stated the evidence was not being admitted for identity, and the jury was instructed only to consider the evidence as tending to show a common scheme or plan.

**B. Prejudice**

Scott contends the erroneous admission of evidence of the Buenrostro crimes violates both the Federal and State Constitutions. Under the State Constitution we may not reverse a judgment absent a "miscarriage of justice." (Cal. Const., art. VI, §§ 13.) To find a miscarriage of justice, we must be persuaded it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

1      Here, it does not appear reasonably probable that the jury was influenced by evidence of the Buenrostro crimes to Scott's prejudice or that the admission of the evidence affected the verdict. At trial, both Obregon and Saucedo identified the replica assault weapon used against them, the same weapon found at the foot of the bed in the room where Scott was arrested. At the time of his arrest, Scott was wearing Obregon's Star of David ring. Saucedo observed both Scott and Sandra Miller at length and at close quarters during his ordeal, identified both at the first opportunity in a photo line-up, and identified Scott at trial. Scott and Miller were found together in a bedroom in the apartment on 89th Avenue, at which time Miller had the keys to Saucedo's vehicle in her jacket pocket and Saucedo's vehicle was parked outside the apartment. Obregon identified Miller at the first opportunity at a photo lineup but did not pick out Scott. At a subsequent preliminary hearing, he narrowed the identification to two photos, one of which was of Scott. Obregon was never asked to identify Scott from a physical lineup, but at trial he unhesitatingly identified Scott as his assailant. In the face of such compelling evidence, and after "an examination of the entire cause," we conclude there is no reasonable probability here a result more favorable to Scott would have been reached if evidence of the Buenrostro crimes had not been admitted. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

Scott also asserts the erroneous admission of evidence of the Buenrostro crimes violates his rights to due process under the Federal Constitution. Where, as here, defendant did not object at trial on Federal Due Process grounds, Scott may make only a "very narrow due process argument" on appeal as to whether the admission of evidence of the Buenrostro crimes had the "additional legal consequence of violating due process." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) The erroneous admission of evidence results in a due process violation "only if it makes the trial *fundamentally unfair."* (*Id.* at p. 439, citing *Estelle v. McGuire* (1991) 502 U.S. 62, 70.)

The high court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." (*Dowling v. U.S.* (1990) 493 U.S. 342, 352-353.) In this regard, the high court stated judges "are to determine only whether the action complained of ... violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions, [citation] and which define' 'the community's sense of fair play and decency' [citation]." ( *Ibid.*) As we have already noted, the evidence linking Scott to the Buenrostro crimes was weak. Moreover, the jury was instructed that evidence of the Buenrostro crimes could not be considered to prove Scott is a person of bad character or had a disposition to commit crimes. The jury was also instructed not to consider the Buenrostro evidence for any purpose unless it found by a preponderance of the evidence Scott committed those crimes, and was cautioned and reminded that before Scott could be found guilty of *any* crime charged, the evidence as a whole must persuade it beyond a reasonable doubt Scott was guilty of that crime. In light of the insubstantial evidence linking Scott to the Buenrostro crimes, and the limiting instructions provided by the trial court, we cannot hold that the introduction of evidence of the Buenrostro crimes "merits th[e] kind of condemnation" necessary to find a violation of fundamental fairness in the trial proceedings. (*Dowling, supra,* 493 U.S. at p. 353.)

**C.    The Decision Of The State Court Of Appeal Was Not An Unreasonable Determination Of Fact Nor An Unreasonable Application Of Controlling United States Supreme Court Authority**

On federal habeas review, the question is whether the admission of the challenged evidence was so prejudicial in the context of the trial as to render the conviction unfair. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (state

1   court's ruling does not violate due process unless evidence is "of such quality as necessarily

2   prevents a fair trial," citation omitted); *Dubria v. Smith*, 224 F.3d 995, 1001 (9th Cir. 2000) (en

3   banc). Even the admission of irrelevant evidence does not violate due process, unless it "so infected

4   the trial with unfairness as to make the resulting conviction a denial of due process." *Romano v.*

5   *Oklahoma*, 512 U.S. 1, 12-13 (1994), citation omitted; *Hamilton v. Vasquez*, 17 F.3d 1149, 1159 (9th

6   Cir. 1994) (erroneous admission of letters written by defendant did not render the trial unfair); *Rupe*

7   *v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996) (erroneous admission of evidence that defendant had

8   gun collection did not violate due process, where improper testimony was brief, prosecutor did not

9   call attention to evidence, and other evidence of guilt was weighty). "A habeas petitioner bears a

10  heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*,

11  404 F.3d 1159, 1172 (9th Cir. 2005).

12          In the case at bar, the state court of appeal cited *Estelle*, 502 U.S. at 70 , as the controlling

13  authority. Petitioner makes no argument that the state court of appeal unreasonably applied *Estelle*.

14          The state court of appeal's determination that petitioner's trial was not fundamentally

15  unfair was not unreasonable. Even if the Buenrostro evidence was irrelevant to the question of

16  identity, there was ample other evidence that petition was the person who committed the charged

17  crimes. This is so because, for example, he was identified by the victims of both charged offenses,

18  Exh. D, RT 132, 188  [Obregon]; RT 320, 359-360, 379 [Saucedo], and he was arrested wearing

19  Obregon's ring. Exh. D, RT 121-122, 403-407, 458-460. In addition, Obregon identified petitioner

20  in a photographic lineup. Exh. D, RT 118, 132, 177-178, 232-233. The police found Saucedo's car

21  keys in the Miller's jacket when she was arrested with petitioner. Exh. D, RT 408-409. Moreover,

22  Obregon and Saucedo identified the paintball gun found with petitioner at the time of his arrest as

23  the weapon petitioner used. Exh. D, RT 131-133, 201-202, 234-235 [Obregon]; RT 329-330

24  [Saucedo]; RT 402-404, 412-416 [police arrest petitioner and recover gun]. When the police came

25  to arrest petitioner, he looked out from the bedroom door, slammed it shut, locked it and said, "It's

26  the police." Exh. D, RT 399. Saucedo took the police to the apartment immediately after the

27  robbery. Exh. D, RT 381.

28          Accordingly, petitioner has failed to show that the evidence rendered his trial unfair.

1   Even if the state court's ruling is contrary to or an unreasonable application of Supreme

2   Court precedent, that error justifies overturning the conviction only if the error had a "'substantial

3   and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S.782,

4   795 (2001), *quoting Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Calderon v. Coleman*, 525

5   U.S. 141 (1998) (per curiam) (court applied *Brecht* to what was presumed to be constitutional

6   instructional error on the governor's commutation power).

7   **D.   No Prejudice Resulted**

8   Even if the state court's ruling is contrary to or an unreasonable application of Supreme

9   Court precedent, that error justifies overturning the conviction only if the error had a "'substantial

10   and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507

11   U.S. 619, 637 (1993); *see Fry v. Plifer,* 127 S.Ct. 2321 (2007)

12   Any error was harmless in this case because the evidence linking petitioner to the

13   *Buenrostro* crimes was weak, and the jury was instructed not to consider that evidence for any

14   purpose unless it believed petitioner had committed those crimes.  Thus, in all likelihood, the jury

15   disregarded that evidence.  The jury was also expressly instructed not to consider the Buenrostro

16   evidence to show petitioner's propensity to commit crimes, and that it must find each element of the

17   charged crimes beyond a reasonable doubt in order to convict petitioner.  Under these circumstances,

18   any error had no substantial or injurious effect on the verdict under *Brecht*.

19   **E.   There Is No Instructional Issue**

20   Petitioner relies upon here briefs which he filed in the state court of appeal and supreme

21   court.  In those briefs, he claimed that CALJIC No. 2.50 was flawed.  We disagree.  The court

22   instructed the jury:

23   Evidence has been introduced for the purpose of showing that the defendant committed
    crimes other than those for which he is on trial.  This evidence, if believed, may not be
24   considered by you to prove that defendant is a person of bad character or that he has a
    disposition to commit crimes.  *It may be considered by you only for the limited purpose*
25   *of determining if it tends to show  a characteristic method, plan or scheme in the*
    *commission of criminal acts similar to the method to the method, plan, or scheme used in*
26   *the commission of the offense in this case which would further tend to show a clear*
    *connection between the other offense*; that is, the Buenrostro offense, and the one of which
27   the defendant or – – ones of which the defendant is accused, *so that it may inferred that*
    *if defendant committed the other offenses, defendant also committed the crimes charged*
28   *in this case*.

Exh. D, RT 615, italics added.

Petitioner must show that there is a reasonable likelihood that the jury misunderstood and misapplied the law, which is resolved upon consideration of all relevant circumstances, including the instructions in their entirety, the trial record, and the arguments of counsel. *Boyde v. California,* 494 U.S. 370, 380-381 (1990); *Estelle v. McGuire,* 502 U.S. 62, 72 & fn. 4 (1991). "CALJIC No. 2.50 was and is a correct statement of the law." *People v. Linkenauger*, 32 Cal.App.4th 1603, 1615 (1995).

Petitioner's deconstruction fails.

Petitioner asserts,

(1) The jury could consider the uncharged crime evidence in "determining if it tends to show a characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case. . . ." That is, *regardless of who committed the charged and uncharged crimes,* were they committed in a similar manner?

Exh. E, AOB 45, italics added.

We disagree. The issue of who committed the uncharged acts was not separated out as petitioner would have it. As instructed, the jury had to find that he committed the uncharged offense and to do that the jury had to find he committed the charged offenses before it could use the evidence of the uncharged offenses to show common plan.

Petitioner asserts,

(2) If so, such a "characteristic method, plan or scheme . . . *would further tend to show a clear connection* between the other offense; that is, the Buenrostro offense, and the . . .ones of which the defendant is accused. . . ." (Italics added.) Reasonably understood, the court informed the jury that as a result of the "characteristic" finding, a "clear connection" between charged and uncharged crimes *had been established.* (Cf. *People v. Owens* (1994) 27 Cal.App.4th 1155, 1158: "Instructing the jury that the People have introduced evidence 'tending to prove' petitioner's guilt *carries the inference that the People have, in fact, established guilt."* (Italics added.)

Exh. E, AOB 46.

We disagree. Petitioner's linkage of this argument to the preceding point demonstrates its flaw. The jury had to find he committed the uncharged acts, before using the uncharged offenses to show common plan. Moreover, the jury was not told that a clear connection "had been established." The instruction leaves it up to the jury to determine whether it shows a plan which

Memo. of Points & Authorities in Support of Answer, etc.,                    *Scott v. Felker* - C07-4279 CRB (PR)

11

1   would further show a clear connection. The instruction does not tell the jury the uncharged

2   misconduct evidence does show a clear connection. The instruction explained the jury could use

3   the uncharged evidence to show, if it did, a common plan.[1/]

4          Next, petitioner asserts,

5      (3) Based on this "clear connection," *it may be inferred that if defendant committed the
       other offenses, defendant also committed the crimes charged in this case."* (Italics

6      added.) Here, the instruction allowed the jury to *infer petitioner's identity* as perpetrator
       of the charged crimes from the second required finding — his *commission of the*

7      *uncharged crimes.* But such an inference would be improper as a matter of law for two
       reasons.

8   Exh. E, AOB 46.

9          We disagree. Petitioner's first reason asserts that this part of the instruction was

10  "improper criminal disposition reasoning." Not so. The instruction clearly told the jury the

11  uncharged misconduct evidence cannot be used to show criminal disposition. Exh. D, RT 615.

12  Petitioner argues that this admonition was insufficient because the instruction permitted the jury to

13

14  _____

15      1. *Owens, supra,* 27 Cal.App.4th 1155 involved a wholly different instruction, CALJIC No.
    10.42.6 dealing with substantial sexual contact. *Id.,* at p. 1158. While it found the phrase "tending

16  to prove" erroneous, nothing in the discussion is relevant to the instruction here which uses the
    phrase "tending to show." Indeed, *Owens* found that the error would be corrected if the erroneous

17  phrase was replaced with "for the purpose of showing." Thus,

18          Petitioner next argues that CALJIC No. 10.42.6 was impermissibly slanted
       toward the prosecution. The instruction stated, in part: "The People have introduced

19     evidence tending to prove that there are more than three acts of substantial sexual
       conduct or lewd and lascivious conduct upon which a conviction in Count I may be

20     based. Defendant may be found guilty if the proof shows beyond a reasonable doubt
       and you unanimously agree that the defendant committed three such acts. It is not

21     necessary that you unanimously concur on which acts constitute the required
       number." Petitioner claims the phrase, "tending to prove" conveyed the impression

22     that the court believed the evidence showed that more than three acts were
       committed, relieving the prosecution of its burden of proof beyond a reasonable

23     doubt.

24          Petitioner's contention has merit. Instructing the jury that the People have
       introduced evidence "tending to prove" petitioner's guilt carries the inference that the

25     People have, in fact, established guilt. This inference would be eliminated if the
       phrase "for the purpose of showing" was substituted for "tending to prove," so that

26     the instruction would read: "The People have introduced evidence for the purpose
       of showing that there are more than three acts . . . ."

27

28  *Id.*, at pp. 1158-1159.

1   disregard it.  Exh. E, AOB 46.  Not so.  The instruction about the use of the uncharged misconduct

2   evidence did no such thing as a complete reading shows.  *People v. Felix,* 14 Cal.App.4th 997

3   (1993), upon which petitioner relies, is inapposite because in that case the jury was not instructed

4   on the proper use of uncharged misconduct evidence to prove identity. *Id.*, at 1009.

5          The second reason petitioner raises is that the instruction, in contravention of *Ewoldt,*

6   allowed proof of common plan to show identity.  Exh. E, AOB 47.  We disagree.  The jury was

7   instructed that it could use the common-plan evidence "so that it may be inferred that if defendant

8   committed the other offenses, defendant also committed the crimes charged in this case."  Exh. E,

9   RT 615.  But, the jury was instructed that it could not use the uncharged offense evidence to prove

10  petitioner's identity of the charged crimes.  *Id.*  That part of the instruction upon which petitioner

11  relies tracks *Ewoldt.*  That is, the instruction tells the jury it cannot use the evidence to find common

12  plan, etc., unless it finds the charged and uncharged offenses have such a "clear connection" with

13  each other that it may be inferred petitioner committed them all.  It says nothing about using the

14  uncharged misconduct  offenses to infer petitioner's identity as the perpetrator of the charged

15  offenses.

16         Petitioner claims that CALJIC No. 2.50 was a permissive inference instruction which

17  allowed the jury to convict him without finding he was guilty beyond a reasonable doubt.  Exh. E,

18  AOB 47, citing *Ulster County Court v. Allen,* 442 U.S. 140  (1979).   The short answer is that

19  CALJIC No. 2.50 allowed no such thing because it specifically told the jury,  "If you find other

20  crimes were committed by a preponderance of the evidence, you are, nevertheless, cautioned and

21  reminded that before a defendant  can be found guilty of any crime charged in this trial, the evidence

22  as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime."

23  Exh. D, RT 614-616.  *People v. Reliford,* 29 Cal.4th 1007 (2003) is instructive.  That decision

24  analyzed the 1999 revised instructions on propensity evidence. The court noted that the jury was

25  instructed on the elements of each charged offense and told that a conviction required proof of

26  "each" of those elements.  "No reasonable juror would believe those requirements could be satisfied

27  solely by proof of uncharged offenses."  *Id.* at 1013-1014.  In other words, a juror could not

28  "reasonably interpret the instructions to permit a finding that defendant inserted his finger into the

1  victim's vagina and anus against her will and then raped her - without considering any of the

2  evidence of those offenses." *Id*. at 1014.  Thus, the Court found that "a conviction based solely on

3  the uncharged conduct is a 'logical impossibility.'" *Id*. at 1014.  *Reliford* also found no reasonable

4  likelihood the jury was misled about the burden of proof.  The instructions expressly informed the

5  jury that the prosecution had the burden of proving a defendant guilty beyond a reasonable doubt,

6  and  "[a]ny other reading would have rendered the reference to reasonable doubt a nullity." *Id.* at

7  p. 1016.

8       Petitioner attempts to discount the fact that the jury was specifically instructed that his

9  guilt must be proved beyond a reasonable doubt by arguing the jury was more likely to follow the

10  "detailed instruction on common plan theory . . ."  As we explained, the CALJIC instruction was

11  proper.  Petitioner, then, asserts that the jury would find him guilty based upon a preponderance of

12  evidence using CALJIC Nos. 2.50.1 and 2.50.2.  Exh. E, AOB 48.  Not so.  CALJIC Nos. 2.50,

13  2.50.1, and 2.50.2 were clearly limited to the common plan evidence.  They neither supplanted, nor

14  undermined, the instruction on reasonable doubt and the instruction that all elements of the crimes

15  had to be so proved.  See, e.g., Exh. D, RT 614-616 [jury instructed that it must convict petitioner

16  of charged offenses beyond a reasonable doubt even though it only had to find the uncharged

17  misconduct evidence by a preponderance].

18       Petitioner argues, drawing together the threads of his various arguments, that the jury

19  could use the uncharged offense to find he committed the charged crimes based upon a

20  preponderance of evidence.  Exh. E, AOB 48.  Not so.  His threads are wrong as we have shown.

21  The court properly instructed the jury:

22       Evidence has been introduced for the purpose of showing that the defendant committed
         crimes other than those for which he is on trial.  This evidence, if believed, may not be
23       considered by you to prove that defendant is a person of bad character or that he has a
         disposition to commit crimes.  It may be considered by you only for the limited purpose
24       of determining if it tends to show  a characteristic method, plan or scheme in the
         commission of criminal acts similar to the method to the method, plan, or scheme used in
25       the commission of the offense in this case which would further tend to show a clear
         connection between the other offense; that is, the Buenrostro offense, and the one of
26       which the defendant or – – ones of which the defendant is accused, so that it may inferred
         that if defendant committed the other offenses, defendant also committed the crimes
27       charged in this case.

28  Exh. D, RT 615.

1

**CONCLUSION**

2    Accordingly, for the reasons stated, respondent respectfully requests that the petition for

3    writ of habeas corpus be denied.

4    Dated:  May 8, 2008

5    Respectfully submitted,

6    EDMUND G. BROWN JR.
     Attorney General of the State of California

7    DANE R. GILLETTE
     Chief Assistant Attorney General

8    GERALD A. ENGLER
     Senior Assistant Attorney General

9

10   PEGGY S. RUFFRA
     Supervising Deputy Attorney General

11

12   /s/ John R. Vance

13   _____
     JOHN R. VANCE, JR.
     Deputy Attorney General

14   Attorneys for Respondent

15   40249680.wpd
     SF2008400095
16   JRV:je

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3  STATEMENT OF THE CASE                                                          1

4  STATEMENT OF FACTS                                                             2

5  STANDARD OF REVIEW                                                             5

6  ARGUMENT                                                                       5

7  **THE STATE COURT OF APPEAL'S DETERMINATION WAS**
   **A REASONABLE APPLICATION OF CONTROLLING UNITED**
8  **STATES SUPREME COURT AUTHORITY; AND ANY ERROR**
   **WAS HARMLESS**                                                              5
9
   A.   Petitioner's Contention                                                  5
10
    B.   The State Appellate Court Decision                                       6
11
    C.   The Decision Of The State Court Of Appeal Was Not An Unreasonable
12       Determination Of Fact Nor An Unreasonable Application Of Controlling United
         States Supreme Court Authority                                          8
13

14  D.   No Prejudice Resulted                                                   10

15  E.   There Is No Instructional Issue                                         10

16  CONCLUSION                                                                   15

17

18

19

20

21

22

23

24

25

26

27

28

1

<b>TABLE OF AUTHORITIES</b>

2
<b>Page</b>

3
**Cases**

4
*Boyde v. Brown*
404 F.3d 1159 (9th Cir. 2005)                                        9
5
*Boyde v. California*
6
494 U.S. 370 (1990)                                                 11

7
*Brecht v. Abrahamson*
507 U.S. 619 (1993)                                               6, 10
8
*Calderon v. Coleman*
9
525 U.S. 141 (1998)                                                 10

10
*Dubria v. Smith*
224 F.3d 995 (9th Cir. 2000)                                        9
11
*Early v. Packer*
12
537 U.S. 3 (2002)                                                    5

13
*Estelle v. McGuire*
502 U.S. 62 (1991)                                              8, 9, 11
14
*Fry v. Plifer*
15
127 S.Ct. 2321 (2007)                                               10

16
*Hamilton v. Vasquez*
17 F.3d 1149 (9th Cir. 1994)                                        9
17
*Hernandez v. Small*
18
282 F.3d 1132 (9th Cir. 2002)                                        2

19
*Penry v. Johnson*
532 U.S.782 (2001)                                                  10
20
*People v. Ewoldt*
21
7 Cal.4th 380 (1994)                                              6, 13

22
*People v. Felix*
14 Cal.App.4th 997 (1993)                                           13
23
*People v. Linkenauger*
24
32 Cal.App.4th 1603 (1995)                                          11

25
*People v. Reliford*
29 Cal.4th 1007 (2003)                                           13, 14
26
*People v. Watson*
27
46 Cal.2d 818 (1956)                                                 6

28

## TABLE OF AUTHORITIES  (continued)

Page

*Romano v. Oklahoma*
512 U.S. 1 (1994)                                                          9

*Rupe v. Wood*
93 F.3d 1434 (9th Cir. 1996)                                              9

*Ulster County Court v. Allen*
442 U.S. 140  (1979)                                                      13

*Williams v. Taylor*
529 U.S. 362 (2000)                                                        5

*Windham v. Merkle*
163 F.3d 1092 (9th Cir. 1998)                                             8

*Woodford v. Visciotti*
537 U.S.19 (2002)                                                          5


**Statutes**

28 United States Code
        § 2254, subd. (d)                                                  5

California Penal Code
        § 211                                                              1
        § 209, subd. (b)(1)                                                1
        § 209.5, subd. (a)                                                 1
        § 215, subd. (a)                                                   1
        § 236                                                              1
        § 667, subd. (a)                                                   1
        § 667, subd. (e)(1)                                                1
        § 1170.12, subd. (c)(1)                                            1
        § 12022, subd. (b)(1)                                              1


**Other Authorities**
California Jury Instructions
        No.  2.50                                                   10, 11, 13
        No. 2.50.1                                                        14
        No. 2.50.2                                                        14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    ***Antonio Scott v. Tom Felker, Warden***        No.:  **C07-4279 CRB (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>May 9, 2008</u>, I served the attached:

      1.    **ANSWER TO ORDER TO SHOW CAUSE**;
      2.    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO ORDER TO SHOW CAUSE**; and
      3.    **LODGING OF EXHIBITS**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

Antonio Scott
V 42330   C-1118
Post Office Box 3030
Susanville, CA 96127

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 9, 2008, at San Francisco, California.


| J. Espinosa | /s/ J. Espinosa |
|:---:|:---:|
| Declarant | Signature |

Scott.POS.wpd