United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANTONIO S. SCOTT,

Petitioner,

v.

TOM FELKER, Warden,

Respondent.

No. C 07-4279 CRB (PR)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner, a state prisoner currently incarcerated at the California Substance Abuse Treatment Facility and State Prison in Corcoran, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254 claiming denial of his due process right to a fair trial based on evidentiary and instructional error.

**STATEMENT OF THE CASE**

Petitioner was convicted by a jury of carjacking in violation of California Penal Code section 215, subdivision (a), false imprisonment in violation of California Penal Code section 211, kidnaping in the course of carjacking in violation of California Penal Code section 209.5, subdivision (a), and kidnaping for robbery in violation of California Penal Code section 290 subdivision (b)(1). The jury also found true the allegation that petitioner used a deadly and dangerous weapon in violation of California Penal Code section 12022, subdivision (b)(1). On June 24, 2004, the superior court found true the allegation that petitioner had a prior felony conviction for second degree robbery and sentenced him to state

United States District Court
For the Northern District of California

prison for an indeterminate term of life with a total minimum term of 31 years.

On May 31, 2006, the California Court of Appeal struck the enhancements for use of a deadly and dangerous weapon but otherwise affirmed the judgment of the superior court. On September 13, 2006, the California Supreme Court denied review.

Petitioner then filed the instant federal petition for a writ of habeas corpus under 28 U.S.C. § 2254. Per order filed on January 9, 2008, this Court found that the petition, liberally construed, stated cognizable claims under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not issue. Respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

> **A. The Charged Offenses**
>
> **1. December 16, 2002 Incident Involving Victim Brigido Obregon**
>
> On December 16, 2002, Brigido Obregon stopped in his white Chevy Blazer at Pak'n Save in Oakland at around 6 p.m. Obregon heard voices behind him, felt what he took to be a gun pushed into his back, and was told to get in the rear of his vehicle. Obregon was placed in the middle of the back seat with a man on either side of him. A woman sat in the front passenger seat and another man was in the driver's seat; all these individuals were African-American. The man in the driver's seat wore a wig, a baseball hat, and his face was covered with a bandana from the nose down.
>
> After Obregon was in the vehicle, the assailants stripped him of money, rings, chain and bracelets. The man in the bandana held a big gun. They drove off, but Obregon could not see where they were going because he was told to keep his head down. After about ten to fifteen minutes, the car stopped and Obregon was taken into an apartment. The three men took Obregon into a bedroom with the window covered by a piece of sheetrock, where he was robbed of his wallet, beeper and shoes. Later, the man in the bandana came into the room and demanded pin numbers for Obregon's credit cards. He was carrying the gun and wearing Obregon's ring and bracelet, and he threatened to shoot Obregon unless Obregon gave him the pin numbers.
>
> Obregon estimated he was held in the apartment for about 20 hours. Eventually, Obregon was placed in his truck, driven close to San Leandro, and left there after his assailants told him not to look where they were going and to wait a few minutes before leaving. After five or ten minutes, Obregon drove home and called the police.
>
> During his captivity at the apartment, and for only seconds on each occasion, Obregon twice observed through the open bedroom door the man in the bandana without his disguise. Obregon did not identify Scott as the man in the bandana from a photo line-up about a week after the incident but did identify the

woman as Scott's co-defendant Sandra Miller. When shown the same photo display at the preliminary hearing, Obregon chose two males as possibly being the assailant, one of whom was Scott. At trial, Obregon unhesitatingly identified Scott as the man he described as wearing the disguise and handling the gun. Obregon testified that People's Number 8 (black paintball gun) was the weapon used in the offense, and an arresting officer described the weapon (People's 8) as an assault type pistol that shoots paintballs but not bullets.

**2. December 24, 2002 Incident Involving Victim Artemio Saucedo**

On December 24, 2002, at around 7:30 p.m., Artemio Saucedo drove his Ford Thunderbird to an apartment on 89th Avenue, Oakland, in response to a for-rent advertisement posted in a local store. Inside the apartment were a man and two women, one heavy set and one thin. Saucedo was kept waiting for a few minutes before the man got up and pointed a gun at him. Saucedo later described the weapon to the police as a big bazooka-like gun and, at trial, identified the black paintball gun (People's 8) as the gunman's weapon. The gunman told the heavy set woman to search Saucedo, and she took his wallet and car keys. At one point someone knocked on the front door and Saucedo was hastily ushered into a bedroom with a mattress on the floor and the window covered by a piece of sheetrock. There, the gunman demanded the correct pin number for Saucedo's ATM card. After obtaining the pin number, the gunman left the apartment, leaving the thin woman alone to guard Saucedo After awhile, the thin woman fell asleep, and Saucedo escaped. Once outside the apartment, Saucedo saw his car was gone, so he ran all the way home and called the police from there. On December 30, Saucedo identified Scott from a photo lineup as the gunman and also identified Sandra Miller as the heavy-set woman who took his wallet and car keys. Saucedo also identified Scott at trial as the gunman at the apartment.

**B. Uncharged Incident Involving Victim Santiago Buenrostro**

On the evening of December 15, 2002, Santiago Buenrostro was driving his blue 1989 Toyota Corolla on International Boulevard near 88th and 89th Avenues when he stopped at a pedestrian crosswalk. A man got in the rear driver's-side door and put a gun to Buenrostro's head. Another man got in the rear passenger side door and a woman got into the front passenger seat. All were African-American. Buenrostro was ordered to make a right turn and after a few blocks told to stop. During that time, his assailants took his wallet, watch and ring.

While the car was stopped, Buenrostro was pushed into the back seat, and the man who had been sitting in the rear passenger-side seat took over the wheel. The assailants drove around for about twenty or thirty minutes before they stopped at what Buenrostro took to be an ATM machine, because the man who had the gun asked Buenrostro for his pin number. After about an hour, the car stopped somewhere in West Oakland. The man in the back of the car pulled Buenrostro out and threw him on the ground. The two men took his boots. They stood Buenrostro up and walked him to the edge of the lot. Buenrostro started to scream. The men pushed Buenrostro face down in the mud and punched and hit him. Buenrostro pretended to be unconscious, and after he heard the assailants drive away in his car, he stood up and went to the first house he saw to call the police.

At one point while he was still driving the car, Buenrostro tried to open the door to escape. The man behind him struck him on the back of the head with the gun, and the woman in the passenger seat punched him on the cheek with her fist. Buenrostro described the weapon used in the incident as a six-inch blue revolver. Buenrostro identified none of his assailants. He could not identify Scott as one of the perpetrators either at trial or from an earlier photographic line-up. Nor was he

United States District Court
For the Northern District of California

able to give a height and weight description to the police following the incident of any of the assailants.

**D. Other Relevant Details**

On December 18, 2002, Oakland Police Officer John Cowles conducted a search at Apartment 4, 1347 89th Avenue on a matter related to his duties on the Beat Health Unit dealing with problem properties in the community. In a bedroom in the apartment, Cowles found a vehicle registration document stating the license plate and name of the registered owner (Santiago Buenrostro). Cowles stated Scott was not present when he searched the apartment, and he had no information Scott lived at that address. He also stated the police had received several complaints about the apartment being a problem property associated with drugs and prostitution.

On December 23, 2002, Officer Daniel Sakai spotted the blue 1989 Toyota Corolla, license number 2RXV 314, belonging to Santiago Buenrostro, parked in the 1300 block of 89th Avenue. Officer Sakai testified that the Pak'n Save on Hegenberger Road (where Obregon was abducted) is within a mile or so of the 1300 block of 89th Avenue where he found Buenrostro's vehicle.

On December 27, 2002, Officer Parkinson found Saucedo's light blue Thunderbird parked outside 1347 89th Avenue, an address Parkinson associated with suspected carjacking activities. Parkinson and other officers subsequently went up to apartment 4 at that location and were allowed in by the occupant, Charlotte Johnson. Scott and Sandra Miller were found in a bedroom in the apartment with a mattress on the floor and the window covered with sheetrock. At the foot of the mattress was a black pistol grip type assault gun, together with a smaller handgun.[FN3] The police handcuffed Scott and Miller and sat them on a couch in the living room. Miller asked for her jacket. Officer Marv Jackson searched the jacket before handing it to Miller. The keys to Saucedo's Thunderbird were found in a pocket of Miller's jacket. Later that day, Officer Jadallah interviewed Scott at the Eastmont Police Station and noticed that Scott was wearing the large gold ring with a Star of David stolen from Brigido Obregon. At trial, Obregon identified the ring as the one taken from him.

FN3. There is no evidence in the record connecting this handgun to any of the crimes at issue.

Scott did not testify in his defense. In closing argument, defense counsel attacked the reliability of Obregon's and Saucedo's identifications of Scott and argued the prosecution failed to place Scott at the scene of the crimes beyond a reasonable doubt and that police were tipped off about Scott by a drug-dealing informant who was possibly the perpetrator.

People v. Scott, No. A107076, 2006 WL 1493815, *2-4 (Cal. Ct. App. May 31, 2006) (footnote and footnote numbering in original).

/ /

/ /

**DISCUSSION**

I. Standard of Review

This Court may entertain a petition for a writ of habeas corpus 'in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

II. Claims

Petitioner raised two cognizable claims for relief under § 2254: (1) the trial court's admission of evidence of uncharged offenses violated his due process right to a fair trial; and (2) the jury instructions violated his due process right to a fair trial.[1]

A. Evidence of Uncharged Offenses

Permitting a jury to hear evidence of prior crimes or bad acts may violate due process. See Marshall v. Lonberger, 459 U.S. 422, 438-39 n.6 (1983); Fritchie v. McCarthy, 664 F.2d 208, 212 (9th Cir. 1981) (citing Spencer v. Texas, 385 U.S. 554, 561 (1967)). A state court's procedural or evidentiary ruling is not subject to federal habeas review, however, unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). Accordingly, a federal court cannot disturb on due process grounds a state court's decision to admit evidence of prior crimes or bad acts unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).

In order to obtain habeas relief on the basis of an evidentiary error, a petitioner must show that the error was one of constitutional dimension and that it was not harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993). He must show that the error had "'a substantial

[1] Petitioner sought to raise additional claims in his traverse. But it is well-established that a traverse is not the proper pleading to raise additional grounds for relief. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994). In order for the state to be properly advised of additional claims, they must be presented in an amended petition, in response to which the state can file an answer. See id.

and injurious effect' on the verdict." Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623).

Petitioner claims that the trial court erred by allowing the prosecution to introduce evidence of the uncharged Buenrostro incident. He argues that allowing the jury to hear this evidence was prejudicial and violated due process.

The California Court of Appeal found that the trial court did err in admitting evidence of the Buenrosto crime, but concluded that the error was not prejudicial. People v. Scott, 2006 WL 1493815, at *5. The court reasoned that given the ample evidence linking petitioner to the charged crimes, admission of the uncharged incident did not have a prejudicial effect:

> In People v. Ewoldt (1994) 7 Cal.4th 380 ( Ewoldt ), the Supreme Court discussed the different purposes for which evidence of uncharged conduct may be admitted. The Supreme Court stated evidence of uncharged conduct could be introduced to show: (1) intent; (2) common design or plan; or, (3) identity; and noted there are "subtle but significant" differences among the three: "Evidence of intent is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. [¶] Evidence of a common design or plan is admissible to establish that the defendant committed the act alleged. Unlike evidence used to prove intent, where the act is conceded or assumed, [i]n proving design, the act is still undetermined. [¶] Evidence of identity is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator." (Id. at p. 394, fn. 2.) The Supreme Court underscored the importance of these distinctions, stating: "[I]t is imperative that the trial court determine specifically what the proffered evidence is offered to prove, so that the probative value of the evidence can be evaluated for that purpose." ( Id. at p. 406) (Italics added.)
>
> In this case, the trial court purportedly admitted evidence of the Buenrostro incident to show Scott engaged in a common scheme or plan, not for intent or identity. But this is not a case where defendant offered an innocent explanation for his conduct or disputed he committed any wrongdoing despite his presence at the scene of the crime-in such circumstances "the act is still undetermined" and evidence of uncharged conduct to show a common scheme or plan is highly probative on the issue of whether defendant committed the wrongful act as alleged. ( Ewoldt, supra, 7 Cal.4th at p. 394-395 & fn. 2; see also People v. Balcom (1994) 7 Cal.4th 414, 422-426 [evidence of subsequent rape and robbery properly admitted to show common scheme or plan where defendant conceded he engaged in sexual intercourse with the victim but claimed he did not use a gun and victim voluntarily consented].) However, there was no dispute here that Obregon and Saucedo suffered as they described at the hands of their assailants-the contested issue was whether Scott was the individual wielding the replica assault weapon against them. In this situation, the existence of a common scheme or plan had no probative value, was not relevant to any issue in the case, and amounted to inadmissible propensity evidence. (See Evidence Code section 1101, subd. (a); see also Balcom, supra, 7 Cal.4th at p. 422 [evidence that defendant committed an uncharged offense may be

United States District Court
For the Northern District of California

> admitted "if relevant to prove some relevant fact other than the defendant's character" (italics added.) ].) Accordingly, the trial court erred by admitting evidence of the Buenrostro crimes under the theory of common scheme or plan.FN4 (See Ewoldt, supra, 7 Cal.4th at p. 406 [noting "in most prosecutions for crimes such as burglary and robbery, it is beyond dispute that the charged offense was committed by someone; the primary issue to be determined is whether the defendant was the perpetrator of that crime. Thus, in such circumstances, evidence that the defendant committed uncharged offenses that were sufficiently similar to the charged offense to demonstrate a common design or plan (but not sufficiently distinctive to establish identity) ordinarily would be inadmissible"].)
>
> . . .
>
> Here, it does not appear reasonably probable that the jury was influenced by evidence of the Buenrostro crimes to Scott's prejudice or that the admission of the evidence affected the verdict. At trial, both Obregon and Saucedo identified the replica assault weapon used against them, the same weapon found at the foot of the bed in the room where Scott was arrested. At the time of his arrest, Scott was wearing Obregon's Star of David ring. Saucedo observed both Scott and Sandra Miller at length and at close quarters during his ordeal, identified both at the first opportunity in a photo line-up, and identified Scott at trial. Scott and Miller were found together in a bedroom in the apartment on 89th Avenue, at which time Miller had the keys to Saucedo's vehicle in her jacket pocket and Saucedo's vehicle was parked outside the apartment. Obregon identified Miller at the first opportunity at a photo lineup but did not pick out Scott. At a subsequent preliminary hearing, he narrowed the identification to two photos, one of which was of Scott. Obregon was never asked to identify Scott from a physical lineup, but at trial he unhesitatingly identified Scott as his assailant. In the face of such compelling evidence, and after "an examination of the entire cause," we conclude there is no reasonable probability here a result more favorable to Scott would have been reached if evidence of the Buenrostro crimes had not been admitted. ( People v. Watson, supra, 46 Cal.2d at p. 836.)

Id. at *5-6 (citations and footnotes omitted) (emphasis in original).

The California Court of Appeal's rejection of petitioner's claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d). Moreover, the California Court of Appeal did not base its conclusions on an unreasonable determination of the facts. See id. The state appellate court reasonably concluded that petitioner was not prejudiced by the admission of the uncharged Buenrostro evidence because there was substantial other evidence linking petitioner to both charged offenses. The record shows that petitioner was identified by both Obregon and Saucedo; found in the apartment where both men were robbed; found adjacent to where Saucedo's car had been abandoned; found wearing the jewelry of Obregon; and

found in possession of a gun later identified by both Obregon and Saucedo as the one used to perpetrate the crimes against them. See Rep. Tr. at 131-33, 201-202, 234-235.

In addition, the jury was given limiting instructions with regards to the uncharged Buenrostro evidence that explained the proper use and purpose of evidence relating to the uncharged crime. See Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997) (juries are presumed to follow limiting instructions with respect to the purposes for which evidence is admitted).

The substantial evidence linking petitioner to the charged offenses and the limiting instructions regarding the proper application of the uncharged evidence militates against a finding of prejudice in this case. Accordingly, Petitioner is not entitled to federal habeas relief on his claim that the admission of the uncharged Buenrostro evidence violated his due process right to a fair trial. See 28 U.S.C. § 2254(d); see also Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (due process right concerning the admission of propensity evidence is not clearly established as required by § 2254(d)).

B. Erroneous Jury Instruction

With regards to the Buenrostro evidence, the trial court instructed the jury pursuant to CALJIC No. 2.50:

> Evidence has been introduced for the purpose of showing that the defendant committed crimes other than those for which he is on trial. This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show a characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan, or scheme used in the commission of the offense in this case which would further tend to show a clear connection between the other offense; that is, the Buenrostro offense and the one of which the defendant or – ones of which the defendant is accused, so that it may inferred that if defendant committed the other offenses, defendant also committed the crimes charged in this case.

Rep. Tr. at 615.

Petitioner attacks the validity of the instruction on three main grounds: (1) the instruction was ambiguous and confused the jury; (2) the instruction allowed the jury to use proof of common plan to show identity in violation of California law; and (3) the instruction

United States District Court
For the Northern District of California

was a permissive inference instruction which allowed the jury to convict without finding that petitioner was guilty beyond a reasonable doubt.

1. Ambiguous Instruction

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See Estelle v. McGuire, 502 U.S. at 72 & n.4; Boyde v. California, 494 U.S. 370, 380 (1990).[2] However, a determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. See Calderon v. Coleman, 525 U.S. 141, 146 (1998). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting habeas relief. See id. at 146-47 (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Petitioner claims that the instruction allowed the jury to ignore the issue of identity and convict him solely on the basis of whether the uncharged and charged crimes were committed in a similar manner. He also claims that because the instruction informed the jury that "as a result of the 'characteristic' finding, a 'clear connection' between charged and uncharged crimes had been established," the instruction "carrie[d] the inference that the People ha[d], in fact, established guilt."

Contrary to petitioner's claims, the instruction did not "separate out" the identity of the perpetrator of the uncharged Buenrostro offenses. Under the instruction, the jury had to find that petitioner committed the uncharged offenses before it could use the evidence of the uncharged offenses to show a common plan. Moreover, the instruction did not inform the jury that a "clear connection" between the uncharged and charged crimes had been established; rather, it made clear that it was up to the jury to determine whether there was a clear connection between the uncharged and charged crimes.

[2] A "reasonable likelihood" is lower than the "more likely than not" standard but higher than a mere "possibility." Polk v. Sandoval, 503 F.3d 903, 910 (9th Cir. 2007).

Petitioner is not entitled to federal habeas relief on this claim because it cannot be said that there is a reasonable likelihood that the jury applied the instruction in a manner that violates the Constitution. See Estelle, 502 U.S. at 72 & n.4. And even if there was constitutional error, relief would not be appropriate because the error could not be said to have had a substantial and injurious effect or influence on the jury's verdict. See Brecht, 507 U.S. at 637. As noted in connection with petitioner's improper admission of evidence claim, substantial evidence other than the uncharged Buenrostro evidence clearly linked petitioner to the charged offenses against Obregon and Saucedo.

2. Common Plan and Identity

Petitioner claims that the instruction violated the precepts laid out by the California Supreme Court in People v. Ewoldt, 7 Cal. 4th 380 (1994), by allowing proof of common plan to show identity. The claim is without merit because it is well-established that federal habeas relief is unavailable for violations of state law or for alleged error in the interpretation or application of state law. See Estelle, 502 U.S. at 67-68. But it is nonetheless worth noting that the record makes clear that the jury was instructed that it could only use the common plan evidence "so that it may be inferred that if defendant committed the other offenses, defendant also committed the crimes charged in this case." Rep. Tr. at 615. Contrary to petitioner's suggestion, the jury was not instructed that they could use the uncharged offenses to infer petitioner's identity as the perpetrator of the charged offenses..

3. Permissive Inference

Petitioner claims that CALJIC No. 2.50 was a permissive inference instruction which allowed the jury to convict him on a lower standard of proof. The claim is without merit because the instruction specifically stated, "[i]f you find other crimes were committed by a preponderance of the evidence, you are, nevertheless, cautioned and reminded that before defendant can be found guilty of any crime charged in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime." Rep. Tr. at 614-616. Other instructions in the jury charge also made clear that a guilty verdict requires proof beyond a reasonable doubt. It simply cannot be said that there is a reasonable

**United States District Court**
For the Northern District of California

likelihood that the jury applied the instruction in a way that relieved the state of its burden of proving every element beyond a reasonable doubt. Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009).

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

United States District Court
For the Northern District of California

## CONCLUSION

After a careful review of the record and pertinent law, the court is satisfied that the petition for a writ of habeas corpus must be DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: April 7, 2009

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2007\4279\Scott-A1_DENIAL.wpd